# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
#### 1:06cv2

| | | |
|---|---|---|
| THEODORE R.  ANDERSON, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| Vs. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| JEFFREY R.  DOBSON; GERALD W. | ) | **and ORDER** |
| SODERQUIST; ROBERT W. | ) | |
| MIDDLETON; and ARTHUR D. | ) | |
| ACKERMAN, | ) | |
| | ) | |
| **Defendants/Third-Party** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| Vs. | ) | |
| | ) | |
| HALEAKALA RESEARCH AND | ) | |
| DEVELOPMENT, INC., | ) | |
| | ) | |
| **Third-Party Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the court upon the following motions:

(1)    third-party defendant's Motion to Dismiss (#87);

(2)    plaintiff's and third-party defendant's Motion for Partial Summary Judgment (#70);

(3)    plaintiff's and third-party defendant's Motion for Summary Judgment (#88);

(4)    defendant and third-party plaintiffs' Motion to Extend Discovery Deadline to Complete Deposition of Richard Weinstein (#94);

(5)    plaintiff and third-party defendant's Motion to Strike Video Deposition

-1-

(#97); and

(6)      the joint Motion to Set Trial (#102).

Having carefully considered those motions and having heard oral arguments on February 22, 2007, the court enters the following findings, conclusions, and Recommendation.

<h3 style="text-align:center">FINDINGS AND CONCLUSIONS</h3>

## I.      Background

This action is based on a disagreement between the officers, directors, and shareholders of SmartBand Technologies, Inc. (hereinafter "SmartBand").  Such disagreement and the proceedings in this action have spawned two other lawsuits, one before this court captioned <u>Anderson v. Derrick, *et al.*</u>, 1:06cv264 (W.D.N.C. 2007), which is a legal malpractice action against SmartBand's counsel and his firm, and <u>Anderson v. Dobson, *et al.*</u>, AW-06-3341 (D.Md. 2007), which concerns attorney Richard Weinstein's, counsel for plaintiff and third-party defendant's (an affiant herein), compliance with a subpoena *duces tectum* issued in relation to this matter through the United Stated District Court in Maryland, which was issued in the wake of plaintiff's and third-party defendant's use of Mr. Weinstein's affidavit and an Email in this matter, which revealed confidential client communications related to this matter.

While the pleadings necessary for consideration of the pending motions encompass pleadings that fill three oversized binders, the core factual dispute is relatively straightforward, which is who owned what shares of SmartBand stock on

and after August 17, 2005. As will be discussed below, there is a genuine issue of fact as to what precisely transpired, however, such dispute is not material to resolution of the pending motions, as will be detailed in the pages that follows.

It is plaintiff's contention that he has always been the majority shareholder of SmartBand, and that he was and remained the majority shareholder when on September 19, 2005, he issued *sua sponte* two resolutions (hereinafter the "Anderson Resolutions") first removing the defendants as directors of SmartBand and second, as sole director, firing defendants from their employment with SmartBand. Plaintiff further contends that defendants' *post hoc* and *nunc pro tunc* attempt at issuance of backdated stock certificates and creation of corporate minutes on or after September 21, 2005, did nothing to diminish the legal impact of the Anderson Resolutions. It is plaintiff's contention that the stock certificates were issued fraudulently and backdated in an attempt by defendants to undo what he had lawfully done , that such stock certificates were actually issued without consideration in violation of Delaware law inasmuch as the extant "Stock Award Agreements" had not been executed prior to such issuance, and that even if the stock certificates were properly issued, they were not in existence as of September 19, 2005, when he issued his resolutions.

Defendants' paint a different factual scenario, and argue that at the August 17, 2005, meeting of the SmartBand board of directors and shareholders (at which plaintiff was in attendance), the board and the shareholders unanimously agreed, voted, and resolved to reissue SmartBand stock in such a manner as to make plaintiff no longer the overwhelming majority shareholder, reducing his ownership to minority

status.  According to defendants, all the directors agreed that such course of action was necessary to secure private funding for the underlying venture due to investor concerns as to overwhelming corporate ownership and control by one person, to wit, plaintiff.  It is defendants' contention that once such action was taken by the board and shareholders on August 17, 2005, plaintiff was at that instant no longer the majority shareholder and was without authority as a matter of law when on September 19, 2005, he issued his Resolutions.  Defendants take exception to plaintiff's characterization of their issuance of the new shares as "backdating"; rather, defendants contend that such shares were simply made effective September 14, 2005, which was they contend the day after plaintiff withdrew from negotiations.

Overlaying these factual disputes are fundamental failures in corporate governance.  While Delaware law no longer requires the maintenance of the hardbound ledger and minute books, <u>see</u> 8 Del.C. § 224, Delaware still requires the maintenance of a ledger as "the only evidence as to who are the stockholders . . . or to vote . . . at any meeting of stockholders."  8 Del.C. § 219. It is clear from the evidence presented in this  case that SmartBand, its incorporators, its officers, and its counsel failed to comply with Delaware's now liberalized corporate records requirements, which allow ledgers and minutes to be maintained as electronic data files.  Apparently, no ledger was maintained in any form and and stock ownership was not therein recorded.  From testimony and exhibits concerning the minutes taken at the August 17, 2005, meeting, even the act of taking official minutes fell well below standard business practices.

The factual disputes and disregard for generally accepted business practices and corporate formalities dovetail with the core legal dispute, which is whether as a matter of Delaware law plaintiff was the majority shareholder of SmartBand on September 19, 2005. If he was, then the majority of this action is resolvable by way of summary judgment. The parties are in agreement that such issue is governed by Delaware law and that Delaware law makes no distinction between closely held and publicly traded corporations in rules of governance or in when shares are issued.

## II. Factual Allegations and Claims Contained in the Initial Pleadings

### A. Factual Allegations

The following summary of the initial pleadings is drawn in large part from the district court's Memorandum and Order of May 22, 2006.

Plaintiff is a Massachusetts resident, a scientist, engineer and inventor. Complaint, ¶¶ 1, 7. Plaintiff works in the field of plasma antenna technology for which he holds multiple patents. Id., ¶ 7. Defendants/Third-Party Plaintiffs Dobson, Soderquist, Middleton, and Ackerman (collectively "Defendants") are residents of Tennessee (Dobson), Connecticut (Middleton) and North Carolina (Soderquist and Ackerman). Id., ¶¶ 2-5; Defendants' Answer to Complaint, Counterclaim, Third-Party Complaint and Motion for Preliminary Injunction ("Defendants' Answer"), filed February 21, 2006, ¶¶ 2-5.

Dobson and Soderquist are experienced in the management of high technology companies, while Middleton and Ackerman are experienced in investment banking. Complaint, ¶ 8; Defendants' Answer, ¶ 8. Third-Party Defendant Haleakala Research

and Development, Incorporated ("Haleakala"), is a Massachusetts corporation of which plaintiff is currently the sole director and officer. Defendants' Answer, ¶ 45; Exhibit 1, attached to Defendants/Third Party Plaintiffs' Response and Opposition to Anderson and Haleakala R & D's Motions to Dismiss ("Defendants' Response to Motions to Dismiss"), filed April 18, 2006.

The relationship between these parties began as a result of plaintiff's desire for "the assistance of individuals with expertise in investment banking, marketing, and other business skills" so as to commercialize the technology covered by his patents. Complaint, ¶ 8; Defendants' Answer, ¶ 8. To that end, plaintiff was introduced to the defendants; in or about June 2004, the parties formed SmartBand Technologies, Incorporated ("SmartBand"), a Delaware corporation which is at the heart of this case. Complaint, ¶ 9; Defendants' Answer, ¶ 9.

Of the 100,000 shares of SmartBand stock authorized, 10,000 shares were issued when SmartBand was formed. Exhibit 2, Shareholders' Agreement, attached to Declaration of Theodore R. Anderson, Exhibit A, attached to plaintiff's Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction.

Russell Yelton worked with the plaintiff to form SmartBand Antennas, not to be confused with SmartBand Technologies. Once SmartBand Technologies, Inc., was formed, Yelton became one of its shareholders and officers. Exhibit B, Declaration of Russell Yelton, attached to plaintiff's Reply in Support of Motion for Preliminary Injunction and Opposition to Defendants' Motion for Preliminary Injunction, filed

April 3, 2006, ¶¶ 2-3.

The 500 shares that defendants eventually received were initially distributed to Nanotech Capital, LLC, a North Carolina limited liability company with which the defendants were affiliated. Nanotech subsequently distributed its 500 shares of stock to the defendants. ("Plaintiff's Memorandum in Support of Preliminary Injunction"), filed January 9, 2006. In the original stock dispersion, plaintiff received 9,000 shares, Russell Yelton received 500 shares, and Defendants received 500 shares. Complaint, ¶ 11; Defendants' Answer, ¶ 11. In addition, two stock pools were established, one containing 1,000 shares and the other 500 shares. Id. In addition to being shareholders, the plaintiff and defendants formed the SmartBand Board of Directors, and Defendant Dobson (President and CEO), Plaintiff Anderson (Vice President) and Defendant Soderquist (Secretary) were SmartBand officers. Id.

The SmartBand shareholders entered into a Shareholders' Agreement at or about the time SmartBand was formed. The Shareholders' Agreement provides for restrictions on the transfer of stock, corporate covenants and, importantly, a prohibition on "[a]ny issuance of any stock, stock rights, warrants, options, participations, or securities convertible in stock to any person or entity" without unanimous shareholder consent. Shareholders' Agreement, supra, ¶ 2(4).

On the same date the parties entered into the Shareholders' Agreement, SmartBand and Plaintiff entered into a License Agreement whereby plaintiff gave SmartBand certain rights with respect to his patents for which he received certain present and future monetary consideration. Complaint, ¶ 10; Defendants' Answer, ¶

10; Exhibit 1, License Agreement, attached to Anderson Declaration, <u>supra</u>. The License Agreement provided for termination by plaintiff (the licensor) in certain situations, by SmartBand (the licensee) in certain situations, or by either party in certain situations. License Agreement, ¶ 11. The License Agreement also provides for termination by either party, upon 30-days written notice, in the event certain specified funding benchmarks are not met. <u>Id.</u>, ¶ 11(b)(3).

Once all the agreements were in place, SmartBand began to seek funding. Approximately $250,000 was raised through a convertible debt offering with the intent "that this funding would provide a 'bridge to the first round of equity funding.'" Complaint, ¶ 12; Defendants' Answer, ¶ 12. The equity funding was to be raised through a private placement memorandum ("PPM") and SmartBand sought to raise approximately $2.4 million through this avenue. <u>Id.</u>

In approximately August 2004, the facts and interpretation thereof contained in the initial pleadings begin to diverge. Plaintiff asserts that

> [i]nstead of concentrating their efforts on the business plan and PPM, Defendants embarked on an illegal plan and conspiracy to usurp voting control of SmartBand and to wrest control of Smartbank [sic] from Plaintiff.

Complaint, ¶ 13. Defendants deny such accusation, charging that it was in fact plaintiff's actions that "undermined and blocked" certain agreements, including a voting trust agreement that was negotiated and executed but, due to failure of certain triggering events, never became effective. Defendants' Answer, ¶ 13. Defendants also assert that plaintiff essentially abandoned his duties to SmartBand, focusing all attention and effort on his own company, Third-Party Defendant Haleakala. <u>Id.</u>, ¶ 36.

Despite their disagreement regarding most other post-August 2004 events, the parties do agree that at some point "Dobson and certain other individuals [were awarded stock] from the two initially established stock pools." Complaint, ¶ 13; Defendants' Answer, ¶ 13. This additional stock dispersion "diluted Plaintiff's ownership interest in SmartBand from 90% ownership [immediately after the initial stock dispersion] to an approximate 79% ownership." Id. According to plaintiff, he remains a 79 percent owner of SmartBand.

In addition, plaintiff maintains that pursuant to what he terms the "Anderson Resolutions" of September 19, 2005, he is also the only remaining director and/or officer. Complaint, ¶ 15; Exhibit 4, Anderson Resolutions, attached to Anderson Declaration, supra. Plaintiff maintains that the "Anderson Resolutions" were valid as being executed by the majority shareholder, that they operated to remove each of the defendants as directors and/or officers of SmartBand, and by ignoring such Resolutions, the defendants have violated numerous North Carolina and federal laws. See, e.g., Complaint.

Defendants maintain that at meetings of the SmartBand Shareholders and Directors on August 17, 2005 – meetings at which Plaintiff Anderson was present and participated – "unanimous action [was taken] to enable the issuance of additional shares of stock in SmartBand Technologies, Inc. to the Defendants and others and to split the outstanding shares in preparation for issuance of a [PPM.]" Defendants' Answer, ¶ 15. Defendants contend that after this unanimous action, Plaintiff's shareholder interest was reduced below a majority of outstanding shares, such that the

"Anderson Resolutions" are of no effect.  Defendants' Response and Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction and In Support of Defendants' Motion for Preliminary Injunction ("Defendants' Response in Opposition to Preliminary Injunction"), filed February 21, 2006, at 13-17.

Plaintiff argues that no such "unanimous action" occurred, and that the stock certificates and corporate minutes reflecting such action are fraudulent. Plaintiff's Memorandum in Support of Preliminary Injunction, at 11; Exhibits 1-5, attached to Defendants' Answer.

### B. Discovery and Evidentiary Materials Presented

Discovery in this matter, which was at times tortured and has now involved another district court, did little to advance the ball or add clarity to the version of events portrayed by the parties in their respective pleadings.  What is clear and undisputed from the discovery material is that: the minutes taken by the corporate secretary were mere notations that required a number of E-mails by and between defendants to reconcile and the terms of which neither side is in agreement on; that the purported new shares were not issued until after the Anderson Resolutions; that such shares were in plaintiff's estimation "backdated" and in defendants' opinion "made effective" to September 14, 2005; and that the Stock Award Agreements were not executed prior to issuance of the new stock certificates.

### C. Claims of the Various Parties

#### 1. Claims Asserted by Plaintiff in his Complaint

Plaintiff has asserted claims against defendants for declaratory and injunctive

relief, breach of fiduciary duty, unfair and deceptive trade practices, and for violation of Section 10(b) of the 1934 Securities Exchange Act. Complaint. Plaintiff's claims are based on his contentions that the "Anderson Resolutions" are valid, and by ignoring these resolutions, the Defendants are acting wrongfully.

### 2. Counterclaims Asserted By Defendants in their Answer

Defendants have asserted counterclaims against plaintiff for tortious interference with contract, breach of fiduciary duty, and unfair and deceptive trade practices. Defendants' Answer, ¶¶ 34-42. Defendants contend plaintiff refused to perform his duties in regards to SmartBand and otherwise acted so as to drive SmartBand out of business to the detriment of their rights and interests.

### 3. Third-Party Claims Asserted By Defendants as Third-Party Plaintiffs Against Third-Party Defendant Haleakala Research and Development, Inc.

Defendants have also brought a third-party complaint against Haleakala alleging tortious interference with contract, unfair and deceptive trade practices, and "tortious inducement, support and encouragement of Theodore Anderson's [alleged] breach of his fiduciary duties to the Defendants[.]" Defendants' Answer, ¶¶ 43-52.

In denying Defendant Haleakala's initial Motion to Dismiss, the district court found that "[a]lthough it is not entirely clear from the pleading, Defendants' third-party complaint against Haleakala appears founded on an agency theory, that Plaintiff was acting both individually and as an agent for Haleakala in committing the alleged actions and/or inactions." Docket Entry 44, at 9.

## III.    Discussion

### A.    Haleakala's Motion to Dismiss (#87).

Haleakala has again moved to dismiss, addressing the concerns raised by the district court as to the impact of Mr. Anderson's alleged agency on *in personam* jurisdiction.  Rule 12(b)(2) provides for dismissal where the court lacks personal jurisdiction over a particular named defendant.  In the Fourth Circuit, the standard for deciding a motion based on Rule 12(b)(2) was set forth in Combs v. Bakker, 886 F.2d 673, 676 (4th Cir.1989), where it explained that a plaintiff has the burden to prove personal jurisdiction by a preponderance of the evidence.

When a factual dispute arises as to whether or not jurisdiction exists, the court may either conduct an evidentiary hearing or defer ruling on the matter until it receives evidence on the jurisdictional issue at trial.  Id.  When a court decides the issue on the record then before it, the court may consider "the motion papers, supporting legal memoranda, affidavits, other documents, and the relevant allegations of the complaint," and the burden is plaintiff's "to make a mere *prima facie* showing of jurisdiction to survive the jurisdictional challenge." Clark v. Milam, 830 F.Supp. 316, 319 (S.D.W.Va.1993) (citations omitted).

A court must resolve factual disputes in favor of the party asserting jurisdiction for the limited purpose of the *prima facie* showing.  Bakker, at 676.  Such resolution must include construing all relevant pleadings in a light most favorable to the plaintiff, assume the credibility of any affiant, and drawing  the most favorable inferences for the existence of jurisdiction.  Id.

In this case, Haleakala contends that it lacks minimum contacts with the forum state, North Carolina, even through the activities of Mr. Anderson, and that it would violate due process as well as North Carolina's long-arm statute to require it to defend against third-party plaintiffs' claims in this forum.

Complicating matters, somewhat, is Maryland attorney Richard Weinstein's reluctance , under an assertion of attorney-client privilege to complete a deposition, or tender documents in this matter under a theory that this court did not specifically tell him to do so.[1]  Prior to defendants' noticing and subpoenaing such attorney, Mr. Weinstein gave testimony in this matter by way of affidavit that plaintiff used in support of his motion for preliminary injunction and Haleakala used and continues to use in support of its Motion to Dismiss.  <u>See</u> Docket Entry 87, at 7; Docket Entry 89, at 4 "Exhibit C."

At the hearing of this matter on February 22, 2007, the court questioned counsel for plaintiff and third-party defendant concerning Mr. Weinstein's assertion of the attorney-client privilege in light of the Weinstein Affidavit.  The court was assured by counsel that the Weinstein affidavit did not concern privileged communications between Weinstein and his clients, but detailed  negotiations between Weinstein and SmartBand's counsel Derrick.  Close review of the Weinstein affidavit, however, reveals that while such document is in large part devoted to the interchange between counsel, it appears that Mr. Weinstein did in fact reveal client

---

[1]      The undersigned will address such misreading of the court's earlier Order *infra*.

communications to the court in such affidavit, as follows:

> 12.    After receipt of the purported minutes and table, I called Derrick, and told him, *inter alia*, <u>that my client had told me that the minutes did not accurately reflect what occurred at the August 17, 2005 meeting.</u> I reminded Derrick of our prior conversations and agreements regarding what was to take place at that meeting.

Weinstein Affidavit, at ¶ 12 (emphasis added). In addition, plaintiff forwarded to Mr.

Dobson an Email sent to plaintiff by Mr. Weinstein, which detailed counsel's legal

advice to the plaintiff. Docket Entry 101-3. It appears to be undisputed that Weinstein

serves at counsel to Mr. Anderson personally and as corporate counsel to Haleakala.

The Court of Appeals for the Fourth Circuit has clearly held, as follows:

> The client is the holder of the attorney-client privilege, and can waive it either expressly, or through conduct. The latter type of waiver is referred to as "implied waiver." As a general rule, implied waiver occurs when the party claiming the privilege has made any disclosure of a confidential communication to any individual who is not embraced by the privilege. Such a disclosure vitiates the confidentiality that constitutes the essence of the attorney-client privilege.
>
> Furthermore, such a disclosure not only waives the privilege as to the specific information revealed, but also waives the privilege as to the subject matter of the disclosure.

<u>Hawkins v. Stables</u>, 148 F.3d 379, 384, f.n.4 (4th Cir. 1998)(citations omitted). In this

case, it appears that the attorney initially disclosed a confidential client

communication by way of affidavit, and that each of his clients (Anderson and

Haleakala) have in turn disclosed such to the court as well as opposing counsel, none

of whom are embraced by the privilege. Thus, the privilege has been waived as to

the subject matter of the disclosure.

As discussed at the hearing, the undersigned is troubled by Mr. Weinstein's

invocation of the attorney-client privilege after both his clients clearly abandoned such privilege in a document that has now been submitted to this court twice. The court could, simply, strike Mr. Weinstein's affidavit from consideration as to the merits of the Motion to Dismiss, or the court could, as Rule 12(b)(2) provides, withhold decision on the issue of personal jurisdiction until all the facts are revealed at trial. For the reasons that follow, it does not appear that Mr. Weinstein's affidavit is pivotal to the issue of whether this court has personal jurisdiction over Haleakala.

Defendant Haleakala contends that the action should be dismissed as to it because it does not have the requisite minimum contacts with the State of North Carolina that would justify the exercise of specific personal jurisdiction over it. At the constitutional level, whether or not to exercise jurisdiction over a defendant is a question of fairness. International Shoe Co. v. Washington, 326 U.S. 310, 317-20 (1945).

Rule 12(b)(2) provides for dismissal where the court lacks personal jurisdiction over the defendant. When a court's personal jurisdiction is properly challenged by motion under Federal Rule of Civil Procedure 12(b)(2), the jurisdiction question is one for the court, with the burden on the third-party plaintiff to prove grounds for jurisdiction by a preponderance of the evidence. Combs v. Bakker, supra, at 676. Where there is no evidentiary hearing, the plaintiff need prove only a *prima facie* case of personal jurisdiction. Id.

In deciding whether the plaintiff has proved a *prima facie* case of personal jurisdiction, the district court must draw all reasonable inferences arising from the

proof, and resolve all factual disputes, in the third-party plaintiff's favor. Id.; see also New Wellington Fin. Corp. v. Flagship Resort Dev. Corp., 416 F.3d 290, 294 (4th Cir. 2005). All that is initially required to make a *prima facie* showing of personal jurisdiction are allegations that such jurisdiction exists. Clark v. Remark, 1993 WL 134616, *2 (4th Cir. 1993).[2]

A plaintiff may not rest on mere allegations where the defendant has countered those allegations with evidence that the requisite minimum contacts do not in fact exist. Barclays Leasing v. Nat'l Bus. Sys., 750 F. Supp. 184, 186 (W.D.N.C. 1990). Rather, the plaintiff must come forward with affidavits or other evidence to counter that of the defendant. Id. "Once both parties have presented evidence, factual conflicts must be resolved in favor of the party asserting jurisdiction for the purpose of determining whether [he] has made a *prima facie* showing of jurisdiction." Id.

Because "federal courts exercise personal jurisdiction in the manner provided by state law," New Wellington, supra, the first inquiry must be whether North Carolina's long-arm statute authorizes personal jurisdiction over the third-party defendant. Id. If jurisdiction is authorized by the long-arm statute, the court's second inquiry is "whether exercise of such jurisdiction is consistent with the Due Process Clause of the Fourteenth Amendment." Id. This two-part inquiry collapses into one where, as here, jurisdiction is asserted pursuant to N.C. Gen. Stat. § 1-75.4(1)(d), which provides the opportunity to exercise personal jurisdiction to the extent allowed

---

[2]     Due to the limits of electronic filing, a copies of unpublished decision throughout this Recommendation are incorporated into the docket through reference to the Westlaw citation.

by due process. <u>Dillon v. Numismatic Funding Corp.</u>, 291 N.C. 674, 676 (1977). In such a case, the court's inquiry focuses only on whether due process would be offended by the exercise of jurisdiction.

Personal jurisdiction exists in two varieties, general and specific. General jurisdiction exists where the defendant has such "continuous and systematic" contacts with the forum state that he may be haled into court in that forum on any claim. <u>Helicopteros Nacionales de Colombia, S.A. v. Hall</u>, 466 U.S. 408 (1984). General jurisdiction is not applicable in these circumstances.

Specific jurisdiction is more narrow, existing where the suit against the defendant arises out of his contacts with the forum state or is related thereto. <u>Id.</u> As the district court found earlier, the parties agree that if there is personal jurisdiction over Haleakala, such jurisdiction is of the specific variety. In considering whether specific jurisdiction exists, courts in the Fourth Circuit consider:

(1)     the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State;

(2)     whether the plaintiffs' claims arise out of those activities directed at the State; and

(3)     whether the exercise of personal jurisdiction would be constitutionally reasonable.

<u>New Wellington</u>, 416 F.3d, at 294-95 (citations and internal quotation marks omitted; text separated for purposes of clarity). Only if all three parts are satisfied may a court exercise specific jurisdiction over a defendant consistent with the Due Process

Clause. <u>Yates v. Motivation Indus. Equip. Ltd.</u>, 38 Fed. Appx. 174, 179 (4th Cir. 2002).

Based on the district court's earlier decision, the only avenue left open to asserting specific jurisdiction is on a theory of agency of Mr. Anderson on behalf of Haleakala. Third-Party Defendant Haleakala has moved to dismiss the third-party complaint on the basis that this Court lacks personal jurisdiction, arguing that agency does not provide minimum contacts.

With the exception of the completion of the deposition of attorney and affiant Richard Weinstein, discovery is now complete.    When the issue of personal jurisdiction was first raised, the district court held, as follows:

> it is important to note that this same agency theory forms the basis of the substantive claims against Haleakala. In other words, the question of jurisdiction over Haleakala is inextricably intertwined with the merits of Defendants' claims against the Third-Party Defendant. Given this intertwining, the fact that formal discovery has not yet begun, and that the "agency" issue turns on "information [that] is peculiarly within the [plaintiff and third-party] defendant's knowledge," the Court finds that the better path at this point is to reserve ruling on the issue of personal jurisdiction. After discovery, should Defendants be unable to sufficiently establish that Haleakala is subject to personal jurisdiction of this Court, the Court will grant a renewed motion by Haleakala to dismiss on those grounds.

Docket Entry 44, at 18-19.

In responding to the new or renewed Motion to Dismiss (#87), third-party plaintiffs argue that Haleakala, through the person and presence of Mr. Anderson, had at least two contacts with North Carolina, with those contacts occurring in 2003 and 2005 respectively.    Third-party plaintiffs argue further that their claims against Haleakala arise out of Mr. Anderson's contacts in his capacity as Haleakala's agent

within the forum state.

As to the contacts in 2003, third-party plaintiffs have submitted the verified answers to interrogatories provided by defendant Gerald W. Soderquist in response to interrogatories. Mr. Soderquist avers, as follows:

> My very first introduction to Ted Anderson . . . was in October 2003 at a Carolina Connect Conference where I was guest speaker. Ted Anderson was introduced to me/introduced himself as the founder and principal of Haleakala Research and Development.
>
> * * *
>
> They asked for a meeting with me discuss a partnership to commercialize their technology. This was followed by a meeting in Tryon, NC with Ted Anderson . . . .

Soderquist's Responses to Plaintiff's First Set of Interrogatories, at ¶ 8, Docket Entry 100-4. The undersigned has assumed that this contact was within the State of North Carolina.

As to the contacts in 2005, third-party plaintiffs have submitted the Affidavit of Jeffrey R. Dobson, who was at the relevant time Chief Executive Officer of SmartBand. Mr. Dobson avers, as follows:

> 8.      The acquisition of Haleakala by SmartBand was an agenda item for action by the Directors of SmartBand at the August 17, 2005 meeting. When that matter was discussed, Dr. Anderson participated in the discussion to a much greater extent than he did on any other agenda item at that meeting.
>
> 9.      Dr. Anderson's primary focus was preserving the flow of income to Haleakala R&D, his company. After extensive discussion on this item, it was agreed by all Directors to continue moving toward SmartBand acquiring Haleakala, but the item was tabled pending further parallel discussions between Dr. Anderson, his attorney and the corporate attorney for SmartBand.

Dobson Aff., at ¶¶ 8-9, Docket Entry 100-5.

For the limited purpose of the pending motion, the court has accepted such averments as true as it must under prevailing law discussed supra. The undersigned will, therefore, apply the three factors outlined in New Wellington, supra, to such contacts to determine whether specific jurisdiction exists.

First, it appears to the undersigned that Haleakala, acting through Mr. Anderson, purposefully availed itself of the privilege of conducting activities in North Carolina when it solicited assistance in the state in commercialization of antenna technology in 2003, and again in 2005 when Mr. Anderson advocated at the August 17, 2005, board meeting on behalf of Haleakala and preserving cash flow to Haleakala.

Second, the court must consider whether the plaintiffs' claims arise out of those activities directed at the state. In their third-party Complaint, third-party plaintiffs allege that Haleakala committed tortious interference with contract (the Shareholders Agreement), engaged in unfair and deceptive trade practices, and aided "Theodore Anderson's [alleged] breach of his fiduciary duties to the Defendants[.]" Defendants' Answer, ¶¶ 43-52. Clearly, the solicitation in 2003, if true, is the foundation of all that would follow and ultimately result in this lawsuit. More importantly, however, it appears that Mr. Anderson's advocacy in 2005 on behalf of Haleakala made manifest that Mr. Anderson was at that moment speaking on behalf of Haleakala. The undersigned finds that plaintiffs' claims arise out of activities that occurred in and were in great part directed at North Carolina.

Third, the court has considered whether the exercise of personal jurisdiction

would be constitutionally reasonable. As the Court of Appeals for the Fourth Circuit has stated:

> [W]hen evaluating the propriety of jurisdiction obtained pursuant to a long-arm statute, a two-step analysis is normally required. First, we must determine whether the statutory language applies to the defendant; second, if the statutory language applies, we must determine whether the statutory assertion of jurisdiction is consistent with the due process clause of the Constitution.

English & Smith v. Metzger, 901 F.2d 36, 38 (4th Cir. 1990) (citation omitted). In determining whether the Due Process Clause of the Constitution would be offended, the court considers whether "traditional notions of fair play and substantial justice" would be offended. International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)). The question is not whether the contacts predominate, but whether "enough minimum contacts exist that the district court's assumption of specific jurisdiction satisfied due process." English & Smith v. Metzger, supra. The "fair warning" requirement is satisfied if the defendant has "purposefully directed" his activities at residents of the forum, and the litigation results from the alleged injuries that "arise out of or relate to" those activities. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985).

Most respectfully, the undersigned finds that they do. When Mr. Anderson personally in 2003 visited North Carolina and solicited capitalization on behalf of Haleakala, Haleakala purposely directed its corporate activities at residents of the forum. In response to such efforts in North Carolina , $250,000.00 was raised, which is not an insubstantial sum. Further, the third-party claims that have arisen directly relate to that initial contact and more importantly to the events that allegedly

transpired at the August 17, 2005, meeting.  While Mr. Anderson certainly could have stated at the August 17, 2005, meeting that he was not there to negotiate on behalf on Haleakala and would not do so, it appears from a  fair reading of third-party plaintiff's evidence that he did not exercise his right to remain silent, but advocated on behalf of Haleakala acting at that moment as its agent.

When considered alongside other materials presented, the conclusion is unavoidable that Haleakala has had contacts with this forum sufficient to satisfy specific jurisdiction  and that traditional notions of fair play are not offended.  For whatever reason, Haleakala and Mr. Anderson came all the way from New England to the mountains of North Carolina to seek investors, and it is difficult for this court to fathom how, when the venture goes South, Haleakala can argue in good faith that it  would be unfair to have the action resolved in western North Carolina. Haleakala appears to have purposely directed activities toward residents of the State of North Carolina and the contacts were sufficient to have led such third-party defendant to "reasonably anticipate being haled into court" in North Carolina.  World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).   Therefore, the undersigned determines that this court has specific jurisdiction over Haleakala and that the exercise of such jurisdiction would not offend traditional notions of fair play or substantial justice. The undersigned will respectfully recommend to the district court that third-party defendant's second Motion to Dismiss for lack of *in personam* jurisdiction be denied.

**B.    Plaintiff's and Third-Party Defendant's Motion for Partial Summary Judgment (#70)**

**1.    Introduction and Applicable Standard**

Mr. Anderson and Haleakala have moved for partial summary judgment on Counts I, II, and IV of Anderson's own Complaint.

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial. Upon the moving party's meeting that burden, the non-moving party has the burden of persuasion to establish that there is a genuine issue for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving [sic] party must come forward with "specific facts showing that there is a *genuine issue for trial*." Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted; emphasis in the original) (quoting Fed. R. Civ. P. 56). There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts. Anderson, supra. "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary

judgment." Id. at 248. A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Id. The court must credit factual disputes in favor of the party resisting summary judgment and draw inferences favorable to that party if the inferences are reasonable, however improbable they may seem. Cole v. Cole, 633 F.2d 1083, 1092 (4th Cir. 1980). Affidavits filed in support of a defendants' Motion for Summary Judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves. United States ex rel. Jones v. Rundle, 453 F.2d 147 (3d Cir. 1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. Davis v. Zahradnick, 600 F.2d 458 (4th Cir. 1979).

In determining whether a genuine issue of material fact exists, the admissible evidence of the non-moving party must be believed and all justifiable inferences must be drawn in his or her favor. Anderson, supra, at 255. In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." Id., at 252.

> **2.** **Summary Judgment as to Count I: Declaratory and Injunctive Relief**

In Count One, plaintiff seeks permanent declaratory and injunctive relief including (1) declaration that the Anderson Resolutions were a valid and lawful exercise of plaintiff's rights as majority stockholder of SmartBand and subsequently as sole remaining director of SmartBand, and that, pursuant to the Anderson Resolutions, defendants, as of September 19, 2005, were and are no longer directors,

officers, employees or consultants of SmartBand, (2) enjoining defendants from taking any further actions with respect to or on behalf of SmartBand, or representing themselves as directors, officers, employees or consultants of SmartBand, (3) enjoining defendants from interfering with plaintiff's grant applications, other business relationships, or any other use of the Patents, and (4) directing defendants to turn over to plaintiff all of SmartBand's books, records, accounts, intellectual property rights, and all other assets of any and every kind. Complaint, at ¶ 18.

Plaintiff's motion for summary judgment on this claim is contingent upon a finding that plaintiff was the majority shareholder on September 19, 2005, when he issued the "Anderson Resolutions." The parties appear to agree that the stock certificates were not issued and the Stock Award Agreements were not signed until after the Anderson Resolutions were issued. There is, however, disagreement on whether such certificates were "fraudulently backdated" or simply "made effective" to an earlier date. More importantly, the parties are in complete disagreement on what transpired during the SmartBand August 17, 2005, board of directors meeting, with defendants painting a picture of a unanimous and final vote resulting in a board resolution reducing plaintiff's holdings to a minority status, and plaintiff testifying that no final vote was taken and that the minutes were fraudulently altered. To resolve this motion for partial summary judgment, the undersigned has, therefore, accepted as true defendants' version of events where such version has some support in the evidentiary record. Neither plaintiff's nor defendants' conclusions of law, however, have been accorded such deference.

Plaintiff argues that in applying Delaware law to the facts taken in a light most favorable to defendants, he was in fact majority shareholder of SmartBand on September 19, 2005, because it is undisputed that defendants executed their Stock Award Agreements and received the putative stock certificates only after he issued his resolutions.

Delaware law provides that where the stock ledger of the company does not reflect record ownership (and there clearly is no ledger in this case), the burden is on the stockholder to show that he is indeed a shareholder and to prove the number of shares he holds. Testa v. Jarvis, 1994 WL 30517 (Del.Ch. 1994). Where the issue is voting rights in shares, delivery, either actual or constructive, is required to complete the transfer of shares of stock. Norton v. Digital Applications, Inc., 305 A.2d 656, 659 (Del.Ch. 1973).[3]

In opposition, defendants cite 8 Del. C. § 161 (2006) for the proposition that issuance of a share of a corporation occurs upon approval by the board of directors and, where there is a shareholder agreement requiring it, there must also be approval by the shareholders. See Defendants' Response, Docket Entry 77, at 3-4. While such interpretation of Delaware law is appealing in that it would provide a bright line as to when stock would issue, defendants statement of Delaware law is not accurate. The Delaware Code provision cited by defendants provides, instead, as follows:

**§ 161.  Issuance of additional stock; when and by whom**

---

[3]     In Norton, the issue was whether a stockholder had the right to vote shares that were held in escrow by the corporation on his behalf.

> The directors may, at any time and from time to time, if all of the shares of capital stock which the corporation is authorized by its certificate of incorporation to issue have not been issued, subscribed for, or otherwise committed to be issued, issue or take subscriptions for additional shares of its capital stock up to the amount authorized in its certificate of incorporation.

8 Del.C. § 161.  Thus, defendants' argument is not fully supported by reference to Section 161.  Defendants go on to cite a string of Chancellory cases from the 1920's, but fail to mention a relevant case from the Delaware Supreme Court issued in 2002, Grimes v. Alteon, 804 A.2d 256 (Del. 2002), which is not only relevant to the issue, but  annotated in Section 161 of the Delaware Code which they cited.

In Grimes v. Alteon, 804 A.2d 256 (Del. 2002), the Delaware Supreme Court held, as follows:

> As this Court has stated in requiring strict adherence to statutory formality in matters relating to the issuance of capital stock, the "issuance of corporate stock is an act of fundamental legal significance having a direct bearing upon questions of corporate governance, control and the capital structure of the enterprise. The law properly requires certainty in such matters." Delaware's statutory structure implements these policies through a "clear and easily followed legal roadmap" of statutory provisions. This statutory scheme consistently requires board approval and a writing.

Id., at 260 (citations omitted; emphasis added).  The Court in Grimes goes on to reference Sections 151, 152, 153, 157, 161 and166 of Chapter 8 of the Delaware Code, concluding that

> these provisions confirm the board's exclusive authority to issue stock and regulate a corporation's capital structure. To ensure certainty, these provisions contemplate board approval and a written instrument evidencing the relevant transactions affecting issuance of stock and the corporation's capital structure.

Id., at 261.  Thus, defendants statement of applicable law fails to mention that

issuance of stock does not just occur with board approval, but requires a "written instrument evidencing the relevant transactions." Id. Further, the code sections cited by the Delaware Supreme Court in Grimes require that stock, to be valid, must be issued for proper consideration.

In the wake of Grimes, the Delaware Court of Chancery was faced in Liebermann v. Frangiosa, 844 A.2d 992 (Del. Ch. 2002), with a situation not unlike that presented to this court. In Liebermann, the majority shareholder of MobileToys voted to replace the previous board with himself and, after appointing an additional board member and conferring with such board member by phone, resolved to revoke any prior resolutions of the board authorizing alterations to MobileToys capital structure, specifically resolutions authorizing the issuance of a new class of stock that would have made him no longer the majority shareholder. Id., at 1006-08.

In determining that the majority shareholder remained the majority shareholder even after the board resolved to issue stock that would have made him no longer the majority shareholder, the court applied "settled principles" of Delaware law, citing Grimes, and holding

> that the capital structure and ownership of corporations are matters of great importance and should be settled with clarity, and it is, therefore, fitting and efficient to require strict conformity with the statutory requirements for the issuance and sale of stock.

Id. In applying the logic of Grimes to determination of who had voting rights, the Liebermann court further held that

> [a] corollary to this jurisprudence [as restated in Grimes] is critical to the resolution of this case. Consistent with our law's insistence on adherence to statutory prerequisites to the issuance and sale of stock, our case law

has refused to overlook the statutory invalidity of stock even in situations when that might generate an inequitable result. That is, to the extent that stock is invalid, equitable claims - such as equitable estoppel - will not help a claimant seeking to vote or to validate that stock.

Id., at 1004 -05 (footnote omitted).

The Liebermann court found that even though the MobileToys board had properly approved the issuance of two rounds of new preferred stock, the court concluded that such shares were not validly issued because the board had failed to file with the Delaware Secretary of State a new certificate of incorporation authorizing such new stock species *before* the majority shareholder of the then authorized common stock voted his shares to dissolve the board and rescind the resolutions authorizing the new stock. Id., at 1005. Based on such failure to strictly comply with Delaware law, and despite the obvious inequity, the court strictly applied Delaware law. Id.

Applying the principles of Grimes and Liebermann to the case before this court, it is clear that Delaware requires more than a board resolution, as defendants argued, for stock to validly issue. In Grimes, the Court held that Delaware law requires not only board approval, but "a written instrument evidencing the relevant transactions affecting issuance of stock . . . ." Grimes, supra, at 261. It is undisputed that the only *instrument* evidencing the putative August 17, 2005, issuance of stock were the stock certificates that did not come into existence until after plaintiff had voted his majority stock ownership in favor of replacement of the board of SmartBand. Even assuming that the minutes of the August 17 board meeting were placed in the corporation's minute book prior to the Anderson Resolutions, and that

those minutes reflected a unanimous resolution authorizing reissuance of shares in the manner defendants advocate, it appears that under settled Delaware law shares did not issue until SmartBand issued "written instrument[s] evidencing the relevant transactions." Grimes, supra, at 261. A "written instrument" and "corporate minutes" are clearly different types of writings having separate legal definitions, even in Black's Law Dictionary.

> [C]orporate minutes and other records are not instruments within the meaning of the parol evidence rule; the rule does not apply to documents that contain no obligations. Corporate minutes are not contracts or notes or bills.

Houck v. Martin, 82 Ill.App.3d 205, 212 (Ill.App. 4th Dist. 1980).

Taking as true defendants' version of events that plaintiff approved and the board agreed to issue stock on August 17, an inequitable result would be created through application of Delaware law to plaintiff's unilateral actions of September 19. The decision in Liebermann, however, clearly forecloses any equitable argument on behalf of defendants because "our case law has refused to overlook the statutory invalidity of stock even in situations when that might generate an inequitable result." Liebermann, supra, at 1004-05.

In Liebermann, the majority shareholder simply beat the board to the punch, in that he was able to install himself as the sole director and rescind the prior resolution(s) before the prior board could reach the Secretary of State's office. This is not unlike what has occurred in this case, where plaintiff was able to circumvent the alleged will of the board and shareholders by voting his shares before the board took care of paperwork.

Defendants have cited Kalageorgi v. Kamkin, 750 A.2d 531 (Del. Ch. 1999), for the proposition that "preparation and issuance of share certificates . . . is merely a ministerial act." Defendants' Response, Docket Entry 77, at 4. Defendants' reference is actually to a footnote contained within the Kalageorgi decision, a case which predates Grimes and Liebermann, and which noted as follows:

> If, of course, the directors validly bound the Company to a contract to sell stock to MezhKniga and to the Zabavskys, then the board or the Company could be equitably compelled to perform the ministerial act of issuing the promised shares to those parties.

Kalageorgi, supra, at 539, f.n.10.

Even if this court were to assume that Kalageorgi somehow overruled Grimes and Liebermann, and that corporate preparation, issuance, and delivery of stock certificates is not required under Delaware law for voting rights to attach, c.f. Graham v. Commercial Credit Co., 200 A.2d 828 (Del. 1964), and that stock could be vested upon board resolution and without a written instrument, Grimes, supra, the question would then become whether defendants could have constructively owned the additional shares prior to the Anderson Resolutions.

Even if this court were to put aside what appears to be clear case law from Delaware, it appears that for stock to validly issue, there must be some consideration:

### § 153. Consideration for stock

(a) Shares of stock with par value may be issued for such consideration, having a value not less than the par value thereof, as determined from time to time by the board of directors, or by the stockholders if the certificate of incorporation so provides.

(b) Shares of stock without par value may be issued for such consideration as is determined from time to time by the board of

directors, or by the stockholders if the certificate of incorporation so provides.

(c) Treasury shares may be disposed of by the corporation for such consideration as may be determined from time to time by the board of directors, or by the stockholders if the certificate of incorporation so provides.

8 Del.C. § 153. In this case, it appears to be undisputed in the evidentiary material that a prerequisite to defendants' right to such shares was the execution of "Stock Award Agreements," which plaintiff has submitted in support of his Motion for Partial Summary Judgment. <u>See</u> Docket Entry 72, Attachment 13 (a/k/a/ Ex. 11). It appears to be undisputed that the Stock Award Agreements were not executed until sometime after September 19, 2005, if at all. Because issuance and delivery of stock was necessarily contingent upon defendants tender of consideration under Delaware law, 8 Del.C. § 153, defendants were not entitled to receive such shares prior to plaintiff's issuance of the Anderson Resolutions.

Defendants have, however, made an argument that is unsupported by citation to any evidentiary material that issuance of the additional shares was based on consideration consisting of past and future services, and was not dependent on the execution of the "Stock Award Agreements." <u>See</u> Defendants' Response, at 3. Such evidence would appear to be excludable as parol, inasmuch as it would appear that SmartBand prepared quite detailed Stock Award Agreements that go so far as to delay vesting of such additional shares based on specific performance in the form of raising certain amounts of capital. Docket Entry 72, Attachment 13 (a/k/a/ Ex. 11). In any event, to the extent defendants attempt to rely on future performance,

> Sections 152 and 153 of the Delaware General Corporation Law . . . have been construed to mean that services to be performed in the future are not valid, legal consideration for the issuance of stock by the corporation.

Catherines v. Copytele, Inc., 602 F.Supp. 1019, 1026 (E.D.N.Y. 1985). Indeed, such consideration would violate Article 9, Section 3 of the Delaware Constitution.

While it may be an inequitable result, the undersigned must recommend to the district court that it issue a judgment in favor of plaintiff and against defendants on Count I of the Complaint, providing a

(1) declaration that the Anderson Resolutions were a valid and lawful exercise of plaintiff's rights as majority stockholder of SmartBand and subsequently as sole remaining director of SmartBand, and that, pursuant to the Anderson Resolutions, defendants, as of September 19, 2005, were and are no longer directors, officers, employees or consultants of SmartBand;

(2) enjoining defendants from taking any further actions with respect to or on behalf of SmartBand, or representing themselves as directors, officers, employees or consultants of SmartBand;

(3) enjoining defendants from interfering with plaintiff's grant applications, other business relationships, or any other use of the Patents; and

(4) directing defendants to turn over to plaintiff all of SmartBand's books, records, accounts, intellectual property rights, and all other assets of any and every kind.

### 3. Summary Judgment as to Count II: Breach of Fiduciary Duty as to Dobson and Soderquist

In North Carolina, a fiduciary relationship must exist between the parties before a claim can arise for breach of fiduciary duty. White v. Consol. Planning, Inc., 166 N.C.App. 283, 293 (2004), *disc. review denied*, 359 N .C. 286 (2005).  It is well settled that a fiduciary relationship arises only when plaintiff places special confidence in another person, to the extent that the party in whom such special confidence is placed is bound to act in the best interests of the party placing the confidence. Dalton v. Camp, 353 N.C. 647, 651 (2001). An essential element of the fiduciary relationship is that the purported fiduciary exercised influence over the plaintiff by virtue of the trust placed in such alleged fiduciary.  Id., at 652.

In light of the recommendation resolution of Count I, the allegations of plaintiff's Complaint in Count II are no longer viable.  Inasmuch as it appears that plaintiff was on and after September 19, 2005, the sole director and officer of SmartBand, defendants were no longer directors, officers, or employees of SmartBand, but mere stockholders having no personal obligation to plaintiff.   There is generally no special duty between stockholders, and it is not reasonable to assume that plaintiff could have put any special trust in defendants on or after September 19, 2005.

As argued at page five of plaintiff's reply, the purportedly actionable conduct all occurred after September 19, 2005, in defendants' purported capacities as directors, and none of which is based on any special trust or relationship that may

have arisen under the Shareholders' Agreement. Even if the court were to generously read the pleadings, it could not be inferred that plaintiff put any confidence in defendants, and in fact, plaintiff felt it necessary well before the post September 19 events to retain his own counsel in his dealings with defendants to protect his own rights.

The undersigned notes that had this action been brought before the Court of Chancery in Delaware for a determination of who are the lawful officers and directors of SmartBand as provided under 8 Del.C. § 225, the Delaware courts would have simply dismissed claims of breach of fiduciary duty as collateral to a Section 225 proceeding. Nevins v. Bryan, 885 A.2d 233, 244, f.n. 34 (Del.Ch. 2005).

The undersigned will, therefore, recommend that partial summary judgment in favor of plaintiff be denied as to this claim, and that Claim II of the Complaint be dismissed with prejudice under Rule 12(b)(6) as no longer stating a viable claim against any of the defendants.

### 4. Summary Judgment as to Count IV: SEC Violation

To allege a claim for securities fraud under Section 10(b) of the 1934 Securities Exchange Act and Rule 10b-5 of the Securities Exchange Commission, plaintiff must allege that (1) defendants made a false statement or omission of a material fact, (2) with *scienter*, (3) upon which the plaintiff justifiably relied, and (4) that proximately caused damage to plaintiff. Hillson Partners Ltd. Partnership v. Adage, Inc., 42 F.3d 204, 208 (4th Cir. 1994).

In addition to alleging facts consistent with such elements, private securities

fraud actions must also meet the requirements of the *Private Securities Litigation Reform Act of 1995*, codified as 15 U.S.C. § 89u-4(b) (hereinafter "PSLRA"). The PSLRA imposes on plaintiff a heightened pleading standard, and to properly allege the first element, plaintiff must point to a statement of fact or omission by defendants that is demonstrably false or true, respectively. Longman v. Food Lion, Inc., 197 F.3d 675, 682 (4th Cir. 1999). Such fact or omission must be "material," such that a reasonable purchaser or seller of securities would consider the fact or omission as important in deciding whether to buy or sell or would have viewed the total mix of information made available to be significantly altered by such disclosure. Ottman v. Hanger Orthopedic Group, Inc., 353 F.3d 338, 343 (4th Cir. 2003).

As to the remaining elements, to allege *scienter*, plaintiff may plead either intentional or reckless conduct. As to causation, plaintiff must plead that economic harm resulted from the alleged false statement or omission. Keeney v. Larkin, 306 F.Supp.2d 522, 541 (D.Md. 2003).

First, no cause of action is stated inasmuch as plaintiff lacks standing to bring such a claim. Plaintiff has not alleged that he was the purchaser or seller of securities. Plaintiff appears to contend that he qualifies as a purchaser under the Securities Exchange Act because additional shares were issued to him along with the other shareholders. At best, plaintiff's claim is not that he purchased or sold additional shares, but that the shares that had been originally issued to him had been diluted improperly. Courts have held, however, that in a direct 10b-5 suit,

> dilution of shareholders' equity does not confer "purchaser" or "seller" status on a plaintiff seeking to overcome the standing hurdle . . . .

Perhaps this distinction is best expressed by the court in <u>Sargent</u>: "Thus, although dilution of equity may be an appropriate measure of damages, such dilution does not confer standing."

<u>Meyers v. Moody</u>, 693 F.2d 1196, 1216 (5th Cir. 1982)(quoting <u>Sargent v. Genesco, Inc.</u>, 492 F.2d 750, 765 (5th Cir. 1974); emphasis deleted).

Turning next to properly alleging the elements of a *prima facie* claim, it appears that plaintiff, even if he had standing, has not made allegations that would be sufficient to allege a claim for securities fraud.

Plaintiff has not met the heightened pleading requirement under the PSLRA as to the first element, which requires an allegation that defendants made a false statement or an omission of a material fact. To meet the PSLRA, plaintiff must point to a statement of fact or omission by defendants that is demonstrably false or true. Plaintiff has instead alleged that defendants

misrepresented the stock ownership of the company, fraudulently issued or transferred shares of stock in the company to themselves, engaged in acts in breach of their fiduciary duties, issued false and misleading minutes of the board of directors of SmartBand, and created false records of actions and stockholdings of Smartband.

Complaint, at ¶ 30. Even if such alleged misstatements of fact are demonstrably false, plaintiff has failed to link such "misstatements" to his purchase or his sale of any securities.

As to the fourth element, which requires allegations that the omission or false statement proximately caused damage to plaintiff, causation under federal securities law is two-pronged. <u>Morris v. Wachovia Securities, Inc.</u>, 277 F.Supp.2d 622, 632 (E.D.Va. 2003). Plaintiff must allege facts sufficient for a jury to find in his favor

on transaction causation (that the false statements caused plaintiff to engage in the transaction) and on loss causation (that the false statements caused economic harm). Gasner v. Bd. of Supervisors of the County of Dinwiddie, Va., 103 F.3d 351, 360 (4th Cir. 1996). The fourth element simply cannot be met because, as discussed above, plaintiff was neither the purchaser or seller of securities, and no transaction has or could be alleged.

The undersigned will respectfully recommend that plaintiff's Motion for Summary Judgment on this claim be denied, and that such cause of action be summarily dismissed under Rule 12(b)(6).

## C.  Plaintiff's and Third-Party Defendant's Motion for Summary Judgment

Anderson and Haleakala further seek summary judgment on defendants' and third-party plaintiffs' tort claims. (#88). The undersigned hereby reincorporates the applicable standard previously set forth. Because the same or similar claims are made against both Anderson and Haleakala, the undersigned will address the claims together for the sake of brevity.

### 1.  Tortious Interference With Contract Claims

The elements of tortious interference with contract are "1) the existence of a valid contract between plaintiff and a third party; (2) knowledge by defendant of the contract; (3) acts by defendant to intentionally induce the third party not to perform the contract; (4) defendant's acts were committed without justification; and (5) actual damage to the plaintiff." Barker v. Kimberly-Clark Corp., 136 N.C.App. 455, 462,

524 S.E.2d 821, 826 (2000) (citing Childress v. Abeles, 240 N.C. 667, 674, 84 S.E.2d 176, 181-82 (1954)).  The only contract that is conceivably at issue in this case is the Shareholders' Agreement, to which Mr. Anderson is a party and to which Haleakala is not a party.

As to Mr. Anderson, a party to a contract simply cannot tortiously interfere with his own contract - - he may be capable of breaching that contract - - but under no reported case has a party to a contract been found to tortiously interfere with that contract.   At the time this Counterclaim was filed, North Carolina law was well settled that "a plaintiff cannot maintain an action for interference with contract against a party to that contract."  Coremin v. Sherrill Furniture Co., 2005 WL 1330966, 4 (N.C.App. 2005)(citations to published decisions of the North Carolina Supreme Court and North Carolina Court of Appeals omitted).  The undersigned will recommend that judgment be granted in favor of Mr. Anderson on this aspect of defendants' Counterclaim.

As to Haleakala's motion, it is clearly not a party to the Shareholders' Agreement.  North Carolina law may, however,  treat a third-party to a contract as a "non-outsider" to the agreement in certain circumstances:

> A "non-outsider" to a contract, such as a manager or supervisor with a legitimate business interest in the subject matter of the contract, may be liable for interference with contract only if he acted with legal malice. Accordingly, "[t]he plaintiff's evidence must show that the defendant acted without any legal justification for his action."

Id., at 5.  In this case, SmartBand touted Haleakala as its research arm, making it a non-outsider to the agreement.  As argued by Haleakala, it appears undisputed that

all of its alleged-to-be tortious actions were actions contemplated and bargained for in the Shareholders' Agreement as well as being within the realm of rights Mr. Anderson reserved in the License Agreement. While third-party plaintiffs have speculated that Haleakala could have applied for federal grants for commercial exploitation of the antenna technology, there is no evidence that Haleakala ever did. Instead, the only admissible evidence before the court is evidence that Haleakala applied for and received research and development grants. Finally, there is no evidence that Haleakala induced Mr. Anderson to breach his Shareholders' Agreement; indeed, third-party plaintiffs have not even alleged that Mr. Anderson breached such agreement himself.

While Mr. Anderson may well have mixed loyalties as a shareholder and officer of both Haleakala and SmartBand, such dual capacities are not so unusual or suspect as to impute legal malice to Haleakala based on this record. Indeed, Delaware law specifically provides for circumstances in which a corporation may engage in business with interested stockholders. See 8 Del.C. 203 "Business Combinations with Interested Stockholders."

The alleged business interference may also be justified or privileged. Peoples Security Life Ins. Co. v. Hooks, 322 N.C. 2167 (1988). The North Carolina Supreme Court has held that competition in business may serve as a justification for interference in another's business relations, id., at 221, and inasmuch as third-party plaintiffs have alleged that Haleakala was a competitor of SmartBand, such interference, if any had been shown, would conceivably be justifiable. Emily's

<u>Cookie Mix, Inc. v. Cora Ltd. Partnership</u>, 2005 WL 3046449, **2 (N.C.App. 2005).

The undersigned will recommend that summary judgment be granted in favor of Mr. Anderson and Haleakala on this claim.

## 2. Breach of Fiduciary Duty Claims

As discussed above in the context of plaintiff's own claims of breach of fiduciary duty by defendants, in North Carolina, a fiduciary relationship must exist between the parties before a claim can arise for breach of fiduciary duty. <u>White v. Consol. Planning, Inc.</u>, 166 N.C.App. 283, 293 (2004), *disc. review denied*, 359 N .C. 286 (2005). It is well settled that a fiduciary relationship arises only when plaintiff places special confidence in another person, to the extent that the party in whom such special confidence is placed is bound to act in the best interests of the party placing the confidence. <u>Dalton v. Camp</u>, 353 N.C. 647, 651 (2001). An essential element of the fiduciary relationship is that the purported fiduciary exercised influence over the plaintiff by virtue of the trust placed in such alleged fiduciary. <u>Id.</u>, at 652. Because inducing or "aiding and abetting" is secondary liability, third-party plaintiffs' breach of fiduciary duty claim against Mr. Anderson must first survive summary judgment. <u>Sunbelt Rentals, Inc. V. Head & Engquist Equip., L.L.C.</u>, 2002 WL 31002955 (N.C.Super.Ct. 2002).

Unlike the acts alleged by plaintiff that would have supported his claim for breach of fiduciary duty, which occurred after September 19, third-party plaintiffs' claims are for acts that occurred prior to the Anderson Resolutions. It appears that third-party plaintiffs' claims as to breach of fiduciary duty pivot on Mr. Anderson's

refusal to negotiate at the August 17, 2005, board of director's meeting. While directors certainly owe fiduciary duties to the corporation and shareholders, <u>Cede &Co. V. Technicolor, Inc.</u>, 634 A.2d 345 (Del. 1993), the only evidence of record is that when Mr. Anderson was asked to bargain away Haleakala's rights at the August 17 meeting, he was not at that moment acting as a director of SmartBand, but as the sole officer and director Haleakala. By arguing that Mr. Anderson was acting as an agent for Haleakala on August 17, 2005, for purposes of personal jurisdiction, third-party plaintiffs are now judicially estopped from arguing that he was in fact acting in his capacity as an officer and director of SmartBand when he engaged in negotiations on behalf of Haleakala on August 17, 2005. In <u>King v. Herbert J. Thomas Mem. Hosp.</u>, 159 F.3d 192 (4th Cir. 1998), the appellate court held that

> Judicial estoppel, an equitable doctrine that prevents a party who has successfully taken a position in one proceeding from taking the opposite position in a subsequent proceeding, is recognized to protect the integrity of the judicial system. Acting on the assumption that there is only one truth about a given set of circumstances, the courts apply judicial estoppel to prevent a party from benefiting itself by maintaining mutually inconsistent positions regarding a particular situation. As we have previously observed, the doctrine is invoked to prevent a party from "playing fast and loose with the courts," from "blowing hot and cold as the occasion demands," or from attempting "to mislead the [courts] to gain unfair advantage." As an equitable doctrine, judicial estoppel is invoked in the discretion of the district court and with the recognition that each application must be decided upon its own specific facts and circumstances.

<u>Id.</u>, at 196 (citations omitted). Because the law assumes "that there is only one truth about a given set of circumstances," <u>id.</u>, the Court of Appeals for the Fourth Circuit has adopted the doctrines of judicial estoppel and quasi estoppel to prevent litigants from benefiting from inconsistent factual positions, which not only make a mockery

out of the courts, but would put in jeopardy the full faith and credit afforded to earlier decisions.

In a recent decision, the Court of Appeals for the Fourth Circuit in <u>National Union Fire Ins. Co. of Pittsburgh, Inc. v. Manufacturers and Traders Trust Co.</u>, 2005 WL 670617 (4th Cir. March 23, 2005), recited the elements of judicial estoppel:

> The doctrine of judicial estoppel has three necessary elements:
> (1) The party to be estopped must be asserting a position that is factually incompatible with a position taken in a prior judicial or administrative proceeding; (2) the prior inconsistent position must have been accepted by the tribunal; and (3) the party to be estopped must have taken inconsistent positions intentionally for the purpose of gaining unfair advantage.
> But "judicial estoppel will not be applied where the party's inconsistent positions resulted from inadvertence or mistake."

<u>Id.</u>, 2005 WL, at 2 (citing <u>King</u>, <u>supra</u>). Clearly, this is not a separate legal proceeding; however, the logic is applicable to the unique circumstances of this case:

> First, the doctrine seeks to preserve the sanctity of the oath by demanding absolute truth and consistency in all sworn positions. Preserving the sanctity of the oath prevents the perpetuation of untruths which damage public confidence in the integrity of the judicial system. Second, the doctrine seeks to protect judicial integrity by avoiding the risk of inconsistent results in two proceedings.

<u>Bates v. Long Island R.R. Co.</u>, 997 F. Supp. 1028, 1038 (2d Cir. 1993). "The [judicial estoppel] doctrine is invoked to prevent a party from 'playing fast and loose with the courts,' from 'blowing hot and cold as the occasion demands,' or from attempting 'to mislead the courts to gain an unfair advantage.'" <u>King</u>, <u>supra</u>, at 196.

In any event, the one thing that is undisputed in this case is that both Haleakala

and SmartBand were armed to the teeth with attorneys in their negotiations, and that none of the directors of SmartBand, when dealing with the proposed acquisition of Haleakala, could have reasonably believed that Mr. Anderson was at that moment speaking for anyone other than Haleakala.

For those reasons, third-party plaintiffs' claims against Mr. Anderson and Haleakala fail, and summary judgment should be granted in favor of Mr. Anderson and Haleakala on these claims.

### 3.    Unfair and Deceptive Trade Practices Claims

A state-law claim for Unfair and Deceptive Trade Practices is governed by Chapter 75-1.1(a) of the North Carolina General Statutes, which provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." Id. When such provision was enacted into law in 1969, it contained the following statement of purpose:

> The purpose of this section is to declare, and to provide civil legal means to maintain, ethical standards of dealings between persons engaged in business and between persons engaged in business and the consuming public within this State to the end that good faith and fair dealings between buyers and sellers at all levels of commerce be had in this State.

See former N.C. Gen. Stat. 75-1.1(b) (1969). See also Edmisten v. Penney Co., 292 N.C. 311 (1977) . In response to a decision of the North Carolina Supreme Court in Edmisten, Section 75-1.1(b) was amended in 1977 to read "[f]or the purposes of this section "commerce" includes all business activities, however denominated . . . ." Id.

The UDTPA is, without doubt, a scheme regulating conduct between buyers and sellers and between businesses. See Roberson v. Dale, 464 F.Supp. 680 (M.D.N.C. 1979). See also Liggett Group, Inc. v. Sunas, 113 N.C. App. 19, 31 (1993); Buie v. Daniel Int'l, 56 N.C. App. 445, 448, cert. denied, 305 N.C. 759 (1982). To state a cause of action under the UDTPA, plaintiffs must allege the following:

(1)    conduct constituting an "unfair or deceptive act or practice;"

(2)    conduct "in or affecting commerce," and

(3)    that such conduct proximately caused actual injury to plaintiff.

Food Lion, Inc. v. Capital Cities/ABC Inc., 951 F. Supp. 1224, 1230 (M.D.N.C. 1996).

Again, there is absolutely no evidence, beyond inadmissible speculation, that the allegedly unlawful activities of Haleakala were not contemplated by these parties and specifically provided for in the License Agreement to which SmartBand and Mr. Anderson are the only parties.

As to Mr. Anderson, it is well settled in North Carolina that a UDTPA claim cannot be founded on an alleged breach of contract, unless the claimant can

allege substantial aggravating circumstances attending the breach of contract to support a claim of unfair or deceptive trade practices in North Carolina. Such substantial aggravating circumstances include an intentional misrepresentation made for the purpose of deceiving another and which has the natural tendency to injure another....

DirecTV, Inc. v. Amerilink Corp., 2004 WL 1618572, *7 (M.D.N.C.2004)(citations and corresponding quotation marks omitted).  Third-party plaintiffs have made no allegations and presented no evidence that Mr. Anderson made any misrepresentations, only that he bargained steadfastly on behalf of Haleakala.

The undersigned will, therefore, recommend that summary judgment be granted in favor of Haleakala and Mr. Anderson on these claims.

### D.     Motion to Extend Discovery Deadline to Complete Deposition of Richard Weinstein

The court has considered defendants' and third-party plaintiffs' Motion to Extend Discovery Deadline to Complete Deposition of Richard Weinstein (#94). This falls within the undersigned's jurisdiction to dispose of rather than enter a recommendation.  While Mr. Weinstein and his counsel where unsure whether the undersigned's previous Order providing for the taking of Mr. Weinstein's deposition was intended to require Mr. Weinstein to produce documents at his deposition, the answer is yes.

Before taking the bench, the undersigned practiced law and litigated for nearly 30 years.  Reflecting back on that time, the undersigned simply cannot recall any circumstance in a document driven case, such as this, where the undersigned did not compel document production when noticing a deposition by way of subpoena. Indeed, in many instances the documents were the actual targets of the deposition notices or subpoenas.

Further, as discussed above, the undersigned firmly believes that Mr. Weinstein's clients, Mr. Anderson and Haleakala, have irrevocably waived the attorney-client privilege by twice submitting Mr. Weinstein's affidavit to this court, in which he reveals confidential client communications regarding the subject-matter of this lawsuit, and also Mr. Anderson's submission of his counsel's communication to Mr. Dobson.

In an abundance of caution, and in the event the district court disagrees with the undesigned's resolution of the pending dispositive motions, and to the extent the dispositive motions before the court do not in fact resolve all motions, the court will allow enlargement of time for taking Mr. Weinstein's deposition up to and including the day before trial of this matter. It is the undersigned's further hope that the parties and Mr. Weinstein will see fit to not further burden the District of Maryland.

**E.     Plaintiff and Third-Party Defendant's Motion to Strike Video Deposition (#97).**

Without reaching the merits of the motion, the undersigned has simply not viewed such videotape inasmuch as a transcript of such hearing has apparently been made but not filed. Inasmuch as Mr. Weinstein's deposition is not relevant to the motions now before the court, the undersigned will defer to the district court as to use of such videotape at trial or in any further proceedings. However, counsel for defendants, as an officer in good standing with this court, is granted leave to use video and operate any machine necessary to record Mr. Weinstein's continued deposition, the resumption of which was recently allowed by the United States Court

for the District of Maryland.  Such motion will, therefore, be denied without prejudice as moot.

**F.     Joint Motion to Set Trial (#102).**

This motion is a motion for peremptory setting, which is within the exclusive jurisdiction of the district court.

**RECOMMENDATION**

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that

(1)    third-party defendant's Motion to Dismiss (#87) be **DENIED**;

(2)    plaintiff's and third-party defendant's Motion for Partial Summary Judgment (#70) be **GRANTED** in part and **DENIED** in part as provided <u>supra</u>;

(3)    plaintiff's and third-party defendant's Motion for Summary Judgment (#88) be **GRANTED** as provided <u>supra</u>;

(5)    plaintiff and third-party defendant's Motion to Strike Video Deposition (#97) be **DENIED** without prejudice as **MOOT**; and

(6)    the joint Motion to Set Trial (#102) be considered and determined by the district court as a matter specifically reserved.

**ORDER**

**IT IS, THEREFORE, ORDERED** that defendants' and third-party plaintiffs' Motion to Extend Discovery Deadline to Complete Deposition of Richard Weinstein (#94) is **ALLOWED**, and such deposition may be taken up to the day before trial of this matter.


The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), written objections to the findings of fact, conclusions of law, and recommendations contained herein must be filed within **fourteen (14)** days of service of same. Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir.), cert. denied, 467 U.S. 1208 (1984).


Signed: March 22, 2007

Dennis L. Howell
United States Magistrate Judge